DONALD R. TRAVIS and LENDA L. TRAVIS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Travis v. Commissioner
Docket No. 2677-78.
United States Tax Court
T.C. Memo 1980-251; 1980 Tax Ct. Memo LEXIS 335; 40 T.C.M. (CCH) 658; T.C.M. (RIA) 80251; July 15, 1980, Filed Donald R. Travis, pro se. Barry Bledsoe, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in petitioners' income taxes for calendar years 1971, 1972, and 1973 in the amounts of $4,030.71, $119.56, and $6,478.74, respectively. Some of the issues raised by the pleadings have been disposed of by agreement of the parties leaving for decision (1) whether petitioners are entitled in 1971 to a section 38, I.R.C. 1954, [1] investment credit on construction equipment transferred in that year to a partnership in which petitioner-husband had a 50 percent interest; and (2) whether a portion of the $36,400 received by petitioners in 1973 from CRD Enterprises, Inc., is taxable to them as dividend income. FINDINGS OF FACT Some of the facts *338 have been stipulated and are found accordingly. Donald R. Travis (petitioner) and Lenda L. Travis, husband and wife, who resided in Jackson, Mississippi, at the time of filing their petition in this case, filed joint Federal income tax returns for calendar years 1971, 1972, and 1973 with the Internal Revenue Service Center, Chamblee, Georgia. Throughout 1971, 1972, and 1973 petitioner was employed by Char-Mac Enterprises, Inc. (Char-Mac), a construction business, and was responsible for supervising the coordination of construction jobs. From 1971 until 1973 petitioner owned approximately 32 percent of the outstanding shares of Char-Mac stock. In 1973 petitioner sold his Char-Mac stock to Mr. Charles Duran, the principal shareholder. Because of the existence of a ceiling on the availability of loan money to Char-Mac for the purchase of construction equipment, Mr. Duran formed two corporations, C & D Leasing, Inc. (C & D) and Jackson Equipment Rental, Inc. (Jackson Equipment) to acquire construction equipment needed for the operations of Char-Mac and to lease the equipment to Char-Mac. An accountant advised Mr. Duran and petitioner to form a partnership to hold title to *339 the equipment leased by Char-Mac in order to obtain an investment credit which he told them was unavailable to C & D and Jackson Equipment. Following the accountant's suggestion, Mr. Duran and petitioner entered into an oral agreement prior to January 1, 1971, to become equal partnerts in D & T Investments (D & T). On January 1, 1971, Jackson Equipment and D & T entered into the following agreement: D. & T. INVESTMENTS does hereby agree to assume all lease payments of leases entered into by JACKSON EQUIPMENT RENTAL, INC., as of this date. D. & T. INVESTMENTS will be responsible for all Clauses and Limitations on said leases. D. & T. INVESTMENTS will reimburse JACKSON EQUIPMENT RENTAL for all lease payments made by them in D. & T. INVESTMENTS' behalf. On the same date, Jackson Equipment agreed "to pay D & T INVESTMENTS 85% of its gross rental income as rent on the equipment being rented from D & T INVESTMENTS. JACKSON EQUIPMENT RENTAL, INC. is hereby authorized to use or rent all equipment rented from D & T INVESTMENTS after this date." On September 26, 1971, D & T and C & D entered into an agreement identical to the January 1, 1971, agreement between Jackson Equipment and *340 D & T, which states in full: D & T INVESTMENTS does hereby agree to assume all lease payments of leases entered into by C & D LEASING COMPANY, INC., as of this date. D & T INVESTMENTS will be responsible for all clauses and limitations on said leases. D & T INVESTMENTS will reimburse C & D LEASING COMPANY, INC., for all lease payments made by them in D & T INVESTMENTS' behalf. None of the above agreements referred to specific leases entered into by C & D or Jackson Equipment, and none listed particular rental equipment covered thereby. Between May 10, 1971, and December 30, 1971, D & T entered into 16 written agreements with Jackson Equipment and 2 written agreements with C & D. Each of these agreements was identical except for the equipment listed therein. Each agreement provided in its entirety, except for the list of equipment, as follows: For and in consideration of Ten Dollars, cash in hand, paid me this day in full by D & T INVESTMENTS, I do hereby bargain and sell to him the following personal property: * * * [list of equipment] D & T INVESTMENTS agrees to assume all loans, liens and encumbrances against said property and agrees to reimburse * * * [name of *341 transferor] for all installment payments that they will make. D & T INVESTMENTS further agrees to reimburse * * * [name of transferor] for all taxes, tires, and repair charges. The equipment listed in the 18 agreements was in total the following: Date
Transferor
Equipment
5/10/71
Jackson Equipment Rental
1971 Ford Pick-up
1971 Ford Pick-up
5/30/71
Jackson Equipment Rental
D-5 Cat. Tractor
D-4 Cat. Tractor
Western Water Pump
Sheepsfoot Roller
Lincoln Welder
P. & H. Welder
5/30/71
Jackson Equipment Rental
Electric Vibrator
Gardner Denver
Compressor
Hyster Roller
97 1/2' Power *
6/30/71
Jackson Equipment Rental
Mobile Crane
A-C Motor Grader
6/30/71
Jackson Equipment Rental
45' Lufkin Float
1971 Ford Truck
1971 Ford Truck
1971 Ford Truck
Hendrix Fragline *
Western Water Pump
Tulsa Wench
7/30/71
Jackson Equipment Rental
1969 2-1/2 ton
Chevrolet Truck
Scarifier for *
8/30/71
Jackson Equipment Rental
Trailer
1957 Mack Truck
D-9 Cat.
8/30/71
Jackson Equipment Rental
280 Gallon Water
Tank
8/31/71
Jackson Equipment Rental
1971 Chev. Pick-up
1966 Ford with Water
tank
3 axle Birmingham
Lowboy
2 Hobbs Pole trailers
5 Lufkin Vans
Trailmobile Van
Nabors Trailer
D-8H Cat.
Cat 621 Scraper
Cat 621 Scraper
LS-98 Dragline
Poome Section
LS-98 Dragline
John Deere 820 Loader
G.D. Pump
Diaphragns Pump
Jacger Pump
Kolher Generator
John Deere Disk
International Backhoe
Welder & Combo Kit
9/30/71
C. & D. Leasing Company
1972 Buick
1972 Ford Pickup
9/30/71
Jackson Equipment Rental
LT 8000 Ford Dump
Scarifier for 12-F
AC 745 Loader
Jacger Pump
10/30/71
Jackson Equipment Rental
Hydraulic Pump
11/15/71
Jackson Equipment Rental
1972 Mack
11/30/71
C. & D. Leasing Company
12 feet X 50 feet
Mobile Home
9 G. E. Radios'
11/30/71
Jackson Equipment Rental
40' Dorsey Float
John Deere 450B, 450C
John Deere 600
John Deere 860
Wabco Roller
12/30/71
Jackson Equipment Rental
P & H Mobile Crane
12/30/71
Jackson Equipment Rental
D-6C Cat
12/30/71
Jackson Equipment Rental
D-5 Caterpillar
Tractor
HD-11---AC
HD-11---AC
Cat. 613 Scraper
Cat. 12-F Grader
Cat. 12-F Grader
Cat. 12-F Grader
30-B Crane
966C Cat. Loader
Ferguson Roller
Ferguson RTT300
Roller
*342 Stated
Date
Value
5/10/71
$ 2,880.55
3,041.91
5/30/71
25,000.00
20,000.00
729.75
1,417.50
* 70.68
987.00
5/30/71
251.48
6,176.10
10,351.80
3,572.50
6/30/71
$ 7,600.00
10,500.00
6/30/71
2,625.00
3,495.45
5,810.54
6,003.59
1,200.0 0
508.72
300.00
7/30/71
6,200.00
1,792.33
8/30/71
4,161.94
3,919.57
17,500.00
8/30/71
60.00
8/31/71
3,218.10
656.29
4,500.00
2,150.00
7,400.00
1,315.00
$ 350.00
13,750.00
45,000.00
45,000.00
40,342.27
645.75
25,380.04
4,546.27
225. *
380. *
819.0 *
410.0 *
787.0 *
6,000. *
1,358.5 *
9/30/71
6,700.00
4,002.44
9/30/71
19,573.75
1,643.25
47,620.00
819.00
10/30/71
572.73
11/15/71
20,662.24
11/30/71
3,480.00
$ 11,791.57
11/30/71
$ 2,837.50
18,900.00
9,194.85
51,108.75
1,312.50
12/30/71
77,728.25
12/30/71
32,903.88
12/ 30/71
29,395.86
37,358.00
39,108.00
37,846.93
29,610.57
28,355.52
26,563.19
84,220.00
46,552.48
3,300.15
2,767.80
Some of the above-listed equipment had, prior to the date of the agreement in which it *343 was listed, been rented to Char-Mac for use at its construction sites. After the agreements were entered into, Char-Mac continued the uninterrupted use of the equipment. However, on several occasions the following sequence of events occurred on the same day: (1) C & D or Jackson Equipment purchased new equipment, (2) these companies listed the new equipment acquired by them in one of the 18 agreements, and (3) D & T leased back the equipment to one of the leasing companies for rental to Char-Mac. In 1972, Mr. Ralph Blackmon, Mr. Duran, and petitioner decided to form a corporation for the purpose of developing a parcel of land. The plans proposed that one-third of the stock be issued to each individual. On April 3, 1972, CRD Enterprises, Inc. (CRD) was incorporated; all stock was issued to Mr. Duran. Petitioner transferred to CRD the company's sole physical asset, land known as Pecan Acres. Each Mr. Blackmon and Mr. Duran gave the corporation $5,500 in cash.The 1974 CRD "trial balances" record indicated a carry forward of the prior year's credits of a $5,500 note payable to each petitioner, Mr. Duran, and Mr. Blackmon. In 1973 petitioner received checks from CRD on the *344 dates, in the amounts, and with the notation on the stubs as indicated below: Check
Amount
Check Stub
Date
Number
of Check
Label
3/7/73
48
$ 6,000
none
3/28/73
55
5,000
"draw"
7/11/73
76
8,000
"draw against
profits"
12/26/73
104
17,400
"draw"
Mr. Blackmon and Mr. Duran received similar amounts from CRD in 1973. [2] For that year the retained earnings of CRD were $88,473.68. On August 15, 1973, Mr. Duran signed a 30-day promissory note payable to petitioner in the amount of $11,664.62. This note states as follows: $11,664.62
Jackson, Miss., 8/15/73 19   THIRTY DAYS *345 after date, promise to pay to Donald R. Travis, or order ELEVEN THOUSAND SIX HUNDRED SIXTY-FOUR AND 62/100 DOLLARS for value received, with interest at the rate of 8 per cent, per annum after date until paid with reasonable attorney's fee for collection if not paid when due. The Drawers and Endorsers severally waive presentment for payment, protest and notice of protest and non-payment of this note. B/D: Due: Address: [signed "Charles Duran"] / D & T INVESTMENTS, CHARLES DURAN In 1974, CRD issued the following checks to petitioner, Mr. Blackmon, and Mr. Duran: Check
Amount
Check Stub
Payee
Date
Number
of Check
Label
Petitioner
2/1/74
107
$10,000.00
Salary
Petitioner
2/1/74
108
5,000.00
Pt payment on
note
Petitioner
2/26/74
116
1,280.00
Bal of profit
on Brookleigh
Pt 3 Sale of
25 lots
Mr. Blackmon
2/26/74
117
11,280.00
profit on
Brookleigh Sub
on sale of 25
lots
Petitioner
3/15/74
125
10,999.64
Bal. due
10,979.03
Int. 20.61
Petitioner
2/25/74
112
10,000.00
pt of profit
on Brookleigh
Pt 3 for Dec &
Jan lot sales
(25 lots)
Mr. Duran
2/25/74
113
11,280.00
Pt of profit
on Brookleigh
Pt 3 Sale of
25 lots
*346 On April 14, 1975, and again on November 16, 1978, in a bankruptcy proceeding, the United States District Court, Southern District of Mississippi, adjudged CRD, Jackson Equipment, and C & D as alter egos of Mr. Duran and Char-Mac. The District Court determined that since May 1973 Mr. Duran used Charles Duran, Inc. "as a monetary conduit to make innumerable and continual transfers of cash between and among Duran himself, all of the Duran corporations, Char-Mac Enterprises, Inc., and the defendant Equipment Rental Companies (Jackson Equipment Rental, Inc.; R & L Construction Co., Inc.; C & D Leasing, Inc. and Land Developers, Inc.)." These corporations were deemed bankrupt, and their assets were made available to creditors through the bankruptcy estates of Char-Mac and Mr. Duran. Petitioners claimed an investment credit in their 1971 income tax return in the amount of $4,848.01 and supported their claim by using the following amounts and useful property lives: Type of
Useful
Cost or
Property
Life
Basis
New
3-5 years
$ 6,318.04
New
5-7 years
99,930.00
New
7 or more years
292,108.24
Used
7 or more years
25,000.00
In their 1972 income tax returns *347 petitioners claimed an investment credit of $72.65, resulting from an unused portion of the prior year's investment credit calculation. In his notice of deficiency to petitioners respondent disallowed in full the claimed investment credits explaining "it has not been established that you or the partnership, D & T/ Investments, owned property qualifying for the investment credit under section 38 of the Internal Revenue Code." Petitioners did not report as income in 1973 any of the $36,400 received from CRD; however, in his notice of deficiency respondent treated $29,491.23 as dividend income and increased petitioners' taxable income by a corresponding amount. OPINION Section 38 provides for the allowance of a credit against income tax for investment by a taxpayer in certain qualified property. Qualified property, known as "section 38 property," is defined in section 48(a) and includes only that property which has a useful life of 3 years or more and is depreciable or, in lieu thereof, amortizable. See also section 1.48-1(b)(1), Income Tax Regs. The amount of investment credit available to a taxpayer depends upon the property's useful *348 life and upon whether it is new or used section 38 property."New section 38 property" is defined in section 48(b) as follows: (b) New Section 38 Property. -- For purposes of this subpart, the term "new section 38 property" means section 38 property -- (1) the construction, reconstruction, or erection of which is completed by the taxpayer after December 31, 1961, or (2) acquired after December 31, 1961, if the original use of such property commences with the taxpayer and commences after such date. "Used section 38 property" is defined in section 48(c)(1) as: (c) Used Section 38 Property. -- (1) In general. -- For purposes of this subpart, the term "used section 38 property" means section 38 property acquired by purchase after December 31, 1961, which is not new section 38 property. Property shall not be treated as "used section 38 property" if, after its acquisition by the taxpayer, it is used by a person who used such property before such acquisition (or by a person who bears a relationship described in section 179(d)(2)(A) or (B) to a person who used such property before such acquisition). Other than for "pre-termination property" which is inapplicable to the facts *349 of the instant case, section 49(a)(2) eliminated the availability of investment credit on that section 38 property which was "acquired by the taxpayer after April 18, 1969." However, pursuant to section 50(a)(2) investment credit was reinstated for section 38 property acquired by the taxpayer "(A) after August 15, 1971, or (B) after March 31, 1971, and before August 16, 1971, pursuant to an order which the taxpayer establishes was placed after March 31, 1971." Throughout 1971, 1972, and 1973 petitioner worked for Char-Mac, a construction business. Until 1973 petitioner owned approximately 32 percent of the outstanding shares of Char-Mac stock; however, in that year petitioner sold his Char-Mac stock to Charles Duran, the principal shareholder. Because of the existence of a ceiling on the availability of loan money to Char-Mac for the purchase of construction equipment, Mr. Duran formed two corporations, C & D and Jackson Equipment. C & D and Jackson Equipment acquired that construction equipment needed for the operations of Char-Mac and leased it to Char-Mac. Thereafter, an accountant advised Mr. Duran and petitioner to form a partnership to avail themselves of investment *350 credit purportedly unavailable to the leasing companies with respect to the construction equipment purchased and leased. In response to the accountant's suggestion, by January 1, 1971, without written documentation to formalize the formation of a partnership, Mr. Duran and petitioner treated themselves as equal partners in D & T. On January 1, 1971, Jackson Equipment and D & T entered into a broadly worded agreement whereby D & T would assume all responsibility for existing leases held by Jackson Equipment, including the payment thereof. An identical arrangement was agreed upon between D & T and C & D on September 26, 1971. Also on January 1, 1971, Jackson Equipment agreed to pay D & T/ 85 percent of the gross rental income thereafter collected from the lessees of its rented equipment. Between May 10, 1971, and December 30, 1971, D & T entered into 16 written agreements with Jackson Equipment and 2 written agreements with C & D whereby pursuant to each contract one of the leasing companies would purportedly transfer certain equipment to D & T/ in consideration for $10. These 18 agreements between D & T/ and the leasing companies allegedly transferred to D & T equipment with *351 the total stated value of approximately $1,031,767.34.
Respondent argues that petitioners' claimed investment credit is based upon property which is not either new or used section 38 property as defined in section 48(b) and (c). Each of those paragraphs contains party user limitations. New section 38 property requires that the original use of the property commences after December 31, 1961, with the taxpayer. On the other hand, property is considered "used section 38 property" only if, after the taxpayer's acquisition thereof, the property is used by a person who had not used the property at some time prior to its acquisition by the taxpayer. Congress developed these property user limitations in order to encourage investment and stimulate business activity. H. Rept. No. 1447, 87th Cong., 2d Sess. (1962), 1962-3 C.B. 405, 411-420; S. Rept. No. 1881, 87th Cong., 2d Sess. (1962), 1962-3 C.B. 707, 716-727. As prescribed by section 38(b), the Secretary of the Treasury promulgated section 1.48-3(a)(2), Income Tax Regs., to carry out Congress' intent. In pertinent part, section 1.48-3(a)(2), Income Tax Regs. *352 , provides: (2)(i) Property shall not qualify as used section 38 property if, after its acquisition by the taxpayer, it is used by (a) a person who used such property before such acquisition * * *. Thus, for example, if property is used by a person and is later sold by him under a sale and lease-back arrangement, such property in the hands of the purchaser-lessor is not used section 38 property because the property, after its acquisition, is being used by the same person who used it before its acquisition. Similarly, where a lessee has been leasing property and subsequently purchases it (whether or not the lease contains an option to purchase), such property is not used section 38 property with respect to the purchaser because the property is being used by the same person who used it before its acquisition. In addition, if property owned by a lessor is sold subject to the lease, or is sold upon the termination of the lease, the property will not qualify as used section 38 property with respect to the purchaser if, after the purchase, the property is used by a person who used the property as a lessee before the purchase. [3]
*353 The courts have consistently interpreted section 48 to promote the congressional purposes. For example, in Thompson v. Commissioner,49 T.C. 230 (1967), affd. per curiam 410 F.2d 1195 (9th Cir. 1969), the taxpayers leased certain premises and conducted a business thereon for more than eight years. On April 2, 1962, the taxpayers sold to a corporation the business, including the personal property used in connection therewith. Under the terms of the sale the purchaser gave a note and chattel mortgage to the taxpayers. Within a year the buyer defaulted on its payments; the taxpayers foreclosed, and thereby reacquired the personal property previously transferred. We denied, with the Circuit Court affirming, the taxpayers' claimed investment credit because they had previously used the property for a period of eight years. The basis for our denial of the claimed investment credit was that the same party was using the property at some time both before and after its acquisition by the taxpayer. Section 48(c)(1) does not require that the person who uses the equipment before and after its acquisition by the taxpayer be the taxpayer himself. In fact, the *354 regulations refer to property which is the subject of a sale-leaseback arrangement as not constituting used section 38 property. An examination of the property allegedly transferred from C & D and Jackson Equipment to D & T and leased back to the leasing company making the alleged 1971 transfer reveals that none of the equipment qualifies as section 38 property. Char-Mac used a substantial portion of the equipment both prior to and after its paper transfer from Jackson Equipment and C & D to D & T. The language of section 48(c)(1) excludes this equipment from the definition of used property qualifying for section 38 treatment, since both before and after its purported acquisition by D & T the property was used by the same party, Char-Mac. See Ocrant v. Commissioner,65 T.C. 1156 (1976); Sherar v. United States,413 F.2d 986 (9th Cir. 1969). Petitioners argue that not all property transferred from the leasing companies to D & T had been previously used by Char-Mac. Petitioners claim that on several occasions the following sequence of events occurred on the same day: (1) C & D or Jackson Equipment purchased new equipment, (2) the leasing companies *355 transferred this new equipment to D & T pursuant to numerous agreements, and (3) the partnership leased back the equipment to one of the leasing companies for subsequent rental to Char-Mac. The record, however, does not show what pieces of equipment were new equipment purportedly acquired by D & T/ under this arrangement. For this reason alone, petitioner has failed to show that he is entitled to the claimed investment credit. In addition, D & T's purported business was leasing equipment. Section 46(d) as applicable to the taxable years here in issue provides: (3) Noncorporate lessors. -- A credit shall be allowed by section 38 to a person which is not a corporation with respect to property of which such person is the lessor only if -- (A) the property subject to the lease has been manufactured or produced by the lessor, or (B) the term of the lease (taking into account options to renew) is less than 50 percent of the useful life of the property, and for the period consisting of the first 12 months after the date on which the property is transferred to the lessee the sum of the deductions with respect to such property which are allowable to the lessor solely by reason of section *356 162 (other than rents and reimbursed amounts with respect to such property) exceeds 15 percent of the rental income produced by such property. In the case of property of which a partnership is the lessor, the credit otherwise allowable under section 38 with respect to such property to any partner which is a corporation shall be allowed notwithstanding the first sentence of this paragraph. For purposes of this paragraph, an electing small business corporation (as defined in section 1371) shall be treated as a person which is not a corporation. Petitioner makes no claim that D & T manufactured or produced any of the property on which petitioner claims an investment credit. The record does not show the date of the purported acquisition or purported lease of any new property acquired. No purported transfer of property was made to D & T by C & D prior to September 22, 1971. Petitioner has totally failed to prove that D & T met any of the requirements of section 46(d)(3) with respect to any new property it may have acquired so as to show that the partnership or petitioner, through the partnership, is entitled to any investment credit on any new property D & T may have acquired in *357 1971. Respondent asserts that the transfers of equipment from Jackson Equipment and C & D to D & T are sham transactions and have no substance for tax purposes. Because of the above conclusions we find no need to rule on the merits of this contention. In the early part of 1972 Mr. Blackmon, Mr. Duran, and petitioner decided to incorporate CRD for the purpose of developing land. They planned to issue one-third of the stock to each individual; however, all stock was issued to Mr. Duran. Mr. Blackmon and Mr. Duran transferred $5,500 in cash to the corporation. Petitioner transferred to CRD land known as Pecan Acres.In 1973 petitioner received $36,400 from CRD; in 1974 the corporation paid $37,279.64 to petitioner. The retained earnings of CRD for 1973 were $88,473.68. On August 15, 1973, Mr. Duran signed a 30-day promissory note payable to petitioner in the amount of $11,664.62. Beneath Mr. Duran's signature was the notation, "D & T Investments." Petitioners claim that only a small portion of the $36,400 is income taxable to them in calendar year 1973. Petitioners urge us to consider the land transfer to CRD as a $5,500 loan to the corporation, and they argue that of *358 the moneys received in 1973 from CRD, $5,500 represented a repayment on this loan. Petitioners also claim that a large portion of their 1973 receipts represents the repayment of two 30-day promissory notes in the face amounts of $11,664.62 and $7,321.68; the latter note was not entered into evidence. Petitioners did not report 1973 interest income from either note, although petitioner stated at trial that the face values of the notes included total interest of $2,905.60. Petitioner indicates that when CRD repaid the claimed loans, it did pay $2,905.60 in interest. Respondent argues that of the $36,400, $6,908.77 was a return of capital to petitioner and $29,491.23 was dividend income received by petitioners from CRD in 1973. Respondent bases his position on the contention that petitioner was the beneficial owner of one-third of the stock of CRD during 1973 and that all CRD payments to petitioner were made with reference to his stock rather than as loan repayments. Respondent supports his position by citing Rupe Investment Corporation v. Commissioner,266 F.2d 624 (5th Cir. 1959), affg. 30 T.C. 240 (1958). There on behalf of a certain hotel company *359 the taxpayer, an investment banking organization, agreed through its president to procure the stock of another hotel corporation. The purchaser, rather than the taxpayer, dictated the conditions of the stock acquisition and supplied the purchase funds. The banker acted solely as a broker or middleman in securing the purchase, was not entitled to any enhancement in the value of the seller's stock, and was remunerated on the basis of $1 per common share of stock purchased. Prior to completion of the transaction the seller declared and paid a dividend to all common shareholders of record. At that time the taxpayer was record owner on behalf of the purchaser. Relying upon Griffiths v. Helvering,308 U.S. 355 (1939), and Northern Trust Co. of Chicago v. United States,193 F.2d 127 (7th Cir. 1951), the Circuit Court held that dividend income is taxable to the party that beneficially enjoys that income, regardless of the payee or the title owner of the stock. The Circuit Court considered the purchaser as the beneficial owner since the dividend was applied to reduce the ultimate cost of the stock to the purchaser. Section 301 treats corporate distributions *360 made to noncorporate distributees as either dividend income, return of capital, or gain from the sale or exchange of property. Section 301(a) and (c). The distributee is the beneficial owner of the distributor's stock where title to stock is held on his behalf by another party, including a trustee, agent, or broker. In the instant case, in 1973 Mr. Duran held all of the CRD stock in his name, yet the other indicia of stock ownership of one-third of the stock were in petitioner. This determination is based upon the fact that it was the intention of Mr. Duran, Mr. Blackmon, and petitioner that each equally would own the stock of the corporation. Both Mr. Duran and Mr. Blackmon contributed $5,500 in cash to CRD; petitioner transferred to the corporation its sole physical asset, land worth approximately $5,500. Furthermore, the three men planned that each would receive one-third of the profits of CRD, and petitioner's testimony indicates that in 1973 he considered himself as sharing equally in the profits of CRD. Furthermore, in 1973 Mr. Duran, Mr. Blackmon, and petitioner each received from the corporation amounts aggregating $36,400. On the basis of the evidence in this record *361 petitioners have not established that petitioner in 1973 received from CRD any repayments of loans made by petitioner to Mr. Duran, his corporations, or D & T. In addition to the August 15, 1973, 30-day promissory note, petitioners urge the existence of several loans to Mr. Duran or his corporations aggregating between $25,000 and $30,000, including another 30-day note payable by Mr. Duran with face amount of $7,321.68. Petitioners did not place in evidence any promissory notes other than the August 15, 1973, note for $11,664.62. We have no evidence of when any other loans may have been made by petitioner to Mr. Duran or to any entity in which he owned an interest. Petitioners' assertion that a portion of the moneys received from CRD in 1973 represents repayment of the $11,664.62 note is unconvincing. The only 1973 CRD payment to petitioner after August 14, 1973, was a check issued on December 26, 1973, in the amount of $17,400. The notation on the check stub of this check was "draw." According to a notation on the August 15, 1973, promissory note, presumably written by petitioner, the note was due on September 15, 1973, yet "Charles says [he] will pay [the note] 60 days *362 from Due date." This notation indicates that Mr. Duran and not CRD was to pay petitioner on this note. Also, the notations on the CRD records show some repayment of loans to petitioner by CRD in 1974. Accordingly, we conclude that none of the $29,491.23 paid to petitioner in 1973 by CRD, which respondent has determined constituted a dividend to petitioner, was in repayment of loans. We sustain respondent in his determination that petitioner in 1973 received dividend income from CRD in the amount of $29,491.23. Because of certain issues disposed of by agreement of the parties, Decision will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and as in effect in the years involved.↩
*. Illegible↩
2. Referring to check stubs submitted into evidence, the parties stipulate that each Mr. Blackmon, Mr. Duran, and petitioner received $36,400 from CRD in 1973. However, examination of those check stubs indicates that Mr. Blackmon and petitioner received $36,400 each and Mr. Duran received $31,400 in 1973. We have been unable to determine where the discrepancy lies, but we assume that a check for $5,000 payable to Mr. Duran was erroneously retained by the parties. Consequently, we conclude that each person received $36,400 from CRD in 1973.↩
3. Sec. 1.48-3(a)(3) provides numerous examples in explanation of sec. 1.48-3(a)(2), including the following: Example (1). Corporation P acquires properties 1 and 2 in 1960 and uses them in its trade or business until 1962.In 1962, corporation P sells such properties to corporation Y, which leases back property 1 to corporation P and leases property 2 to corporation S, a wholly owned subsidiary of corporation P. Property 1 is not used section 38 property in the hands of corporation Y because, after its acquisition by corporation Y, it is used by a person (corporation P) who used it prior to such acquisition. * * *
Example (2). In 1962, corporation L leases property from corporation M. In 1964, corporation L acquires the property that it previously had been leasing. The property acquired by corporation L is not used section 38 property because such property is used after such acquisition by the same person (corporation L) who used the property before its acquisition (corporation L). Example (3). Corporation X buys property in 1962 and leases such property to corporation Y. Corporation X in 1965 sells the property to A subject to the lease.The property acquired by A is not used section 38↩ property if such property continues to be used by corporation Y, because corporation Y used the property before its acquisition by A.